## BEFORE THE PRESIDING DISCIPLINARY JUDGE

| | |
|---|---|
| **IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA** | **PDJ 2023-9099** |
| | **FINAL JUDGMENT AND ORDER** |
| **JOSEPH LACOME** Bar No. 032676, | [State Bar Nos. 22-2090, 23-0217, 23-1443, 23-3115, and 24-0602] |
| **Respondent.** | **FILED APRIL 16, 2025** |

The Presiding Disciplinary Judge having accepted the parties' Agreement for Discipline by Consent ("Agreement") submitted pursuant to Rule 57(a), Ariz. R. Sup. Ct.,

**IT IS ORDERED** that **JOSEPH LACOME, Bar No. 032676**, is suspended for six (6) months from the practice of law effective, effective forty-five (45) days from the date of this order, for his conduct in violation of the Arizona Rules of Professional Conduct and Rules of the Supreme Court of Arizona, as set forth in the Agreement documents

**IT IS FURTHER ORDERED** that Respondent comply with the requirements relating to notification of clients and others and provide and/or file all notices and affidavits required by Rule 72, Ariz. R. Sup. Ct.

**IT IS FURTHER ORDERED** that upon reinstatement, Respondent shall immediately resign from the State Bar of Arizona.

**IT IS FURTHER ORDERED** that Respondent pay the costs and expenses of the State Bar of Arizona in the amount of $2,650.00 within 30 days of this order.  There are no costs or expenses incurred by the Office of the Presiding Disciplinary Judge in these proceedings.

**DATED** this 16th day of April, 2025.

*Lisa A. VandenBerg*
**Hon. Lisa A. VandenBerg**
**Presiding Disciplinary Judge**

Copy of the foregoing emailed
this 16th day of  April, 2025, to:

James D. Lee
LRO@staff.azbar.org

Donald Wilson, Jr.
dwj@bowwlaw.com

Danielle Chronister
dnc@bowwlaw.com

by: SHunt

**BEFORE THE PRESIDING DISCIPLINARY JUDGE**

| | |
|---|---|
| IN THE MATTER OF A MEMBER OF THE STATE BAR OF ARIZONA<br><br>JOSEPH LACOME<br>  Bar No. 032676,<br><br>**Respondent.** | PDJ 2023-9099<br><br>**ORDER ACCEPTING AGREEMENT FOR DISCIPLINE BY CONSENT**<br><br>[State Bar Nos. 22-2090, 23-0217, 23-1443, 23-3115, and 24-0602]<br><br>**FILED APRIL 16, 2025** |

On March 28, 2025, the parties filed an Agreement for Discipline by Consent ("Agreement") pursuant to Rule 57(a), Ariz. R. Sup. Ct. The State Bar of Arizona is represented by Senior Bar Counsel James D. Lee. Respondent Joseph LaCome is represented in this matter by counsel, Donald Wilson, Jr. and Danielle Chronister. The Agreement seeks to address the State Bar's Formal Third Amended Complaint filed August 30, 2024 ("Complaint") referencing State Bar Nos. 22-2090, 23-0217, 23-1443, 23-3115, and 24-0602[1].

Contingent upon approval of the proposed form of discipline, Respondent voluntarily waives his right to an adjudicatory hearing, as well as all motions, defenses, objections, or requests that could be asserted. Pursuant to Rule 53(c)(3), Ariz. R. Sup. Ct., the State Bar provided notice of the Agreement and an opportunity to file a written objection to the Complainant by email on February 18, 2025.

---

[1] The Attorney Discipline Probable Cause Committee ("ADPCC") entered an order of probable cause on November 6, 2023 in File Nos. 22-2090, 23-0217, and 23-1443, and on July 17, 2024 in File Nos. 23-3115 and 24-0602.

Complainant in Count 2 of the Complaint/File No. 23-0217, Nery Osbeli Gomez Gonzalez and her Counsel, Holly Cooper who is the Co-Director of the Immigration Law Clinic at the UC Davis School of Law, submitted an objection to the Agreement[2], which will be addressed at the conclusion of this order.

The Agreement details a factual basis in support of Respondent's conditional admissions and is incorporated by reference.[3]  Respondent Joseph LaCome conditionally admits his conduct violated Title 8 of The Code of Federal Regulations, specifically CFR 1003.102(k), CFR 1003.102(n), CFR 1003.102(o), CFR 1003.102(p), CFR 1003.102(q), CFR 1003.102(r), CFR 1003.102(u), and CFR 1003.102(v); and Rule 42, Ariz. R. Sup. Ct., specifically ER 1.1, ER 1.2(a), ER 1.3, ER 1.4(a), ER 1.4(b), ER 1.5(d)(3), ER 3.1, ER 3.3(a), ER 3.4(c), and ER 8.4(d).  As a sanction, the parties agree to a six (6) month suspension, effective 45 days from the date of this order, resignation from the State Bar of Arizona immediately upon reinstatement, and payment of the costs and expenses of the disciplinary proceeding.  The State Bar and LaCome stipulate, "Restitution is not an issue in this matter." The parties further agree to dismiss the following file numbers without probable cause orders having been entered: State Bar File Nos. 24-2193, 24-2264 and 24-2989; and the allegations that Respondent violated 8 CFR 1003.102(a)(1), (c), (j), and (l); Rule 42, Ariz. R. Sup. Ct., ER 1.5(a), ER 1.16(d), ER 4.1(a), ER 5.1, ER 5.3, ER 8.1(a), ER 8.4(c); and Rule 54(c), Ariz. R. Sup. Ct.

---

[2] *See* Exhibit A to the Agreement.
[3] *See* Rule 57(a)(4), Ariz. R. Sup. Ct.

Generally speaking, the ethical issues arose in the context of Respondent LaCome's representation of multiple clients in immigration matters. Between 2020 and 2023, Respondent represented California residents regarding various immigration matters. During that time, Respondent engaged in an overall pattern of neglect of clients, including: the submission of inadequate or "skeletal" documents with little attention to the specific factual or legal issues for specific clients; filed an application for asylum knowing that the signature on the document was not placed by his client; lacked adequate communication with clients or diligent representation of them; waited over a year to file the motions to dismiss removal proceedings in some cases; and further, Respondent's engagement agreements failed to advise clients that they could discharge representation at any time at which time they may be entitled to a refund of all or part of the fees paid.

Sanctions imposed against lawyers "shall be determined in accordance with the American Bar Association's *Standards for Imposing Lawyer Sanctions*" ("ABA Standards") Rule 58(k), Ariz. R. Sup. Ct. In reviewing this Agreement, the PDJ has consider the duties violated, the lawyer's mental state, the actual or potential injury caused by the misconduct, and the existence of aggravating and mitigating factors.

The parties agree that Respondent knowingly and negligently violated duties to his client, the profession, the legal system, and the public causing actual and potential harm as specified in the Agreement.

3

The Agreement relies on ABA Standards 4.42, 6.12, and 6.22 – all of which call for suspension as the presumptive sanction. The parties stipulate to four aggravating factors: (1) pattern of misconduct; (2) multiple offenses; (3) vulnerability of the victims; and (4) substantial experience in the practice of law.[4] They agree that the following three mitigating factor applies: (1) absence of a prior disciplinary record; (2) full and free disclosure to bar counsel or cooperative attitude toward the proceedings; and (3) delay in disciplinary proceedings.

The Presiding Disciplinary Judge ("PDJ") turns to the objection reflected in Exhibit A to the Agreement (the "Objection"). The Objection raises concerns that these Arizona sanctions may not have an effect on the Respondent's license in other states such as Missouri and Texas or upon Respondent's federal immigration practice. In regard to other states, ABA's *Annotated Standards for Imposing Lawyer Sanctions* describes under, Standard 2.9, Purpose of Reciprocal Discipline:

> A lawyer who has been disciplined in one U.S. jurisdiction is subject to reciprocal discipline in any other U.S. jurisdiction in which the lawyer is admitted. The purposes of reciprocal discipline are to prevent a lawyer admitted to practice in more than one jurisdiction from avoiding the effect of discipline by simply practicing in another jurisdiction, to prevent relitigation of misconduct that already has been established in another jurisdiction, and to protect the pubic from lawyers who commit such misconduct.

---

[4] Respondent was licensed to practice law in the State of Arizona on December 15, 2015; in Texas in 2012; in Missouri in 2011; and District of Columbia in 2010.

4

The PDJ certainly encourages other jurisdictions or licensures to consider all of the findings of facts in this matter in considering the appropriate reciprocal order to fashion to protect the public.

The Objection also discusses a concern regarding the costs of Respondent's representation and whether Mr. LaCome has retained money paid to him for services he did not provide. The PDJ relies on the State Bar's avowal provided on page 56 of the Agreement in finding that restitution is not an issue in this matter.

In considering the Agreement and the Objection, the PDJ finds that it is in the best interest of public protection to overrule the Objection.

After reviewing the matters presented, the PDJ concludes that under this specific set of circumstances the Agreement adequately achieves the recognized purposes of the lawyer discipline process.

**IT IS ORDERED** accepting the Agreement for Discipline by Consent. A final judgment and order is separately filed this date.

**DATED** this 16th day of April, 2025.

*Lisa A. VandenBerg*
**Hon. Lisa A. VandenBerg**
**Presiding Disciplinary Judge**

5

Copy of the foregoing e-mailed
this 16th day of April, 2025 to:

James D. Lee
LRO@staff.azbar.org

Donald Wilson, Jr.
dwj@bowwlaw.com
Danielle Chronister
dnc@bowwlaw.com


by: SHunt

James D. Lee, Bar No. 011586
Senior Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, Arizona 85016-6266
Telephone: (602) 340-7250
Email: LRO@staff.azbar.org

Donald Wilson, Jr., Bar No. 005205
Danielle Chronister, Bar No. 034738
Broening Oberg Woods & Wilson, PC
2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004-1047
Telephone: (602) 271-7780
Email: dnc@bowwlaw.com
Respondent's Counsel

## BEFORE THE PRESIDING DISCIPLINARY JUDGE

In the Matter of a Member of
the State Bar of Arizona,

**JOSEPH LACOME,**
    Bar No. 032676,

       Respondent.

**PDJ 2023-9099**

**AGREEMENT FOR DISCIPLINE BY CONSENT**

[State Bar File Nos. 22-2090, 23-0217, 23-1443, 23-3115, 24-0602]

    The State Bar of Arizona and Respondent Joseph LaCome who is represented in this matter by counsel, Donald Wilson, Jr., and Danielle Chronister, hereby submit their Agreement for Discipline by Consent pursuant to Rule 57(a), Ariz. R. Sup. Ct. A probable cause order was entered on November 6, 2023, in File Nos. 22-2090, 23-

0217 and 23-1443, and on July 17, 2024 in File Nos. 23-3115 and 24-0602. A Third Amended Complaint was filed on August 30, 2024. Respondent voluntarily waives the right to an adjudicatory hearing, unless otherwise ordered, and waives all motions, defenses, objections or requests which have been made or raised, or could be asserted thereafter, if the conditional admission and proposed form of discipline is approved.

Pursuant to Rule 53(b)(3), Ariz. R. Sup. Ct., notice of this agreement was provided to the complainants by email on February 18, 2025. Complainants were notified of the opportunity to file a written objection to the agreement with the State Bar within five business days of bar counsel's notice. A copy of the only objection received is attached hereto as Exhibit A.

Respondent conditionally admits that his conduct, as set forth below, violated 8 CFR §§ 1003.102(k), 1003.102(n), 1003.102(o), 1003.102(p), 1003.102(q), 1003.102(r), 1003.102(u) and 1003.102(v); and, Arizona ERs 1.1, 1.2(a), 1.3, 1.4(a), ER 1.4(b), ER 1.5(d)(3), 3.1, 3.3(a), 3.4(c), and 8.4(d).Upon acceptance of this agreement, Respondent agrees to accept imposition of the following discipline: **Six-month suspension from the practice of law,[1] resignation from the State Bar of**

---

[1] The period of suspension to become effective 45 days after entry of a judgment and order accepting this Agreement for Discipline by Consent.

Arizona immediately upon reinstatement, and payment of the costs and expenses of the disciplinary proceeding.[2] The State Bar's Statement of Costs and Expenses is attached hereto as Exhibit B.

## FACTS

### GENERAL ALLEGATIONS

1.      Respondent was licensed to practice law in Arizona on December 15, 2015.

2.      Between 2020 and 2023, Respondent represented California residents regarding various immigration matters. During that time, Respondent was not a member of the State Bar of California.

3.      Upon information and belief, Respondent was admitted to practice law in the District of Columbia in 2010, Missouri in 2011, and Texas in 2012.

### COUNT ONE (File No.  22-2090/Velasquez)

4.      On September 20, 2021, the Department of Homeland Security ("DHS") initiated removal proceedings against Julia Chaj-Velasquez ("Chaj-

---

[2] Respondent must pay the costs and expenses of this disciplinary proceeding within 30 days of entry of a judgment and order accepting this Agreement for Discipline by Consent. If costs are not paid within 30 days, interest will begin to accrue at the legal rate.

Velasquez") and her two daughters (Yohana Julieta de Leon-Chaj and Tatiana Silverly Chaj-Velasquez) by filing Notices to Appear ("NTAs") with the Immigration Court in San Francisco, California.

5.     Chaj-Velasquez hired Respondent on November 29, 2021, to represent her and her two daughters in proceedings before the Immigration Court in San Francisco, California.

      a.     Respondent's engagement agreement stated in Spanish that (a) Respondent would represent Chaj-Velasquez and her two daughters regarding their defensive asylum cases; (b) the total amount due for representation was $8,000; (c) the firm required a deposit of $2,500 before services would begin; (d) the deposit was non-refundable; and (e) the contract did not include representation in an appeal from an Immigration Judge's ruling.

      b.     Respondent's engagement agreement failed to advise Chaj-Velasquez that she could discharge Respondent and his firm at any time, in which case she may be entitled to a refund of all or part of the fee she had paid based upon the value of the representation.

6.     Chaj-Velasquez paid Respondent $8,000 for the representation and provided him with information about her and her daughters' lives in Guatemala.

7.     On January 3, 2022, Chaj-Velasquez and her two daughters admitted the factual allegations in the NTAs, and conceded the charge of removability under the Immigration and Nationality Act.

8.     The Immigration Court sustained the factual allegations and charge of removability.

9.     Respondent filed a Form I-589, "Application for Asylum and for Withholding of Removal" (*Application for Asylum*) on Chaj-Velasquez and her children's behalf, seeking relief in the forms of asylum, the withholding of removal, and protection under the Convention Against Torture Act.

10.     Respondent also filed the following with the Immigration Court on Chaj-Velasquez and her daughters' behalf: a declaration authored by Chaj-Velasquez, a prehearing brief, a "Particular Social Group" (PSG) statement, human rights reports (aka "Country Condition Reports"[3]) for Guatemala for 2020 and 2021, a Guatemalan police or prosecutor's report regarding Chaj-Velasquez's issues in that country, a translation of the birth certificates for Chaj-Velasquez's children, Chaj-Velasquez's identification document, and Chaj-Velasquez's biometrics report.

---

[3] Country Condition Reports reflect how certain crimes are prosecuted and punished in other countries and the efficacy of the government's efforts.

11. The prehearing brief filed by Respondent discussed a PSG inapplicable to Chaj-Velasquez (fear of gang recruitment).

12. The PSG statement filed by Respondent failed to include sufficient facts to support Respondent's assertion of its applicability (the PSG statement was essentially a one-sentence notice of the three social groups into which Chaj-Velasquez and her daughters allegedly fit).

13. On April 14, 2022, Chaj-Velasquez met with Attorney Niloufar Mazhari at a hearing at the Immigration Court. Chaj-Velasquez had not previously met Attorney Mazhari, who appeared on Respondent's behalf. Attorney Mazhari did not speak Spanish or bring an interpreter with her to the hearing.

14. During the April 14, 2022 Immigration Court hearing, Attorney Mazhari asked Chaj-Velasquez about her interactions with three family-member neighbors. She did not ask Chaj-Velasquez how she suffered as a child or how she had been discriminated against and abused because of her indigenous heritage.

15. On May 18, 2022, Immigration Judge Susan Phan denied Chaj-Velasquez and her daughters' *Applications for Asylum*, the withholding of removal, and protection under the Convention Against Torture Act and ordered them to be removed from the United States to Guatemala.

16.     Chaj-Velasquez and her daughters did not timely appeal the May 18, 2022 Immigration Judge's decision.

17.     When Chaj-Velasquez subsequently communicated with Respondent, he told her that he could not file an appeal on her behalf because the filing deadline had passed.

18.     Chaj-Velasquez last spoke with Respondent in or about July 2022.

19.     Chaj-Velasquez and her daughters subsequently obtained the services of immigration attorney Katarina Rost.

20.     Based on *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988),[4] Chaj-Velasquez and Attorney Rost submitted separate charges of misconduct with the State Bar of Arizona regarding Respondent's representation of Chaj-Velasquez and her daughters.

21.     Attorney Rost subsequently filed with the Immigration Court a motion on Chaj-Velasquez and her daughters' behalf captioned "Respondent's Motion to Reopen Based on Ineffective Assistance of Prior Counsel [or] In the Alternative[,] Motion to Reopen Sua Sponte." That motion to reopen Chaj-Velasquez and her

---

[4] *Matter of Lozada*, 19 I&N Dec. 637 (BIA 1988), noted that a motion to reopen an immigration matter based on ineffective assistance of counsel should reflect whether a charge of misconduct has been filed with appropriate attorney disciplinary agencies regarding the representation and, if not, why not.

daughters' immigration cases alleged a number of deficiencies in Respondent's representation of Chaj-Velasquez and her daughters.

22.    Attorney Rost's motion to reopen was denied on November 2, 2022, finding that Chaj-Velasquez "ha[d] failed to establish that 'the proceeding was so fundamentally unfair' that [she] was prevented from reasonably presenting [her] case." (Second and third sets of brackets in original).

23.    Respondent's representation of Chaj-Velasquez and her daughters was deficient in various ways. For example:

    a.    Documents filed by Respondent on Chaj-Velasquez and her daughters' behalf were deficient. For example:

        i.    Respondent submitted an inadequate or "skeletal" prehearing brief on Chaj-Velasquez and her daughters' behalf, which included a discussion of an inapplicable PSG (related to fear of gang recruitment).

    b.    Respondent presented "circular" PSG arguments, which were not supported by statutes/regulations or precedent.

24.    Respondent failed to competently, diligently and properly represent Chaj-Velasquez and her daughters, and failed to adequately communicate with them regarding their matters.

25.     By engaging in the conduct set forth above, Respondent violated 8 CFR §§ 1003.102(n), 1003.102(o), 1003.102(p), 1003.102(q), 1003.102(r) and 1003.102(u); and, Arizona ERs 1.1, 1.2(a), 1.3, 1.4(a), 1.4(b), 1.5(d)(3)and 8.4(d).

## COUNT TWO (File No. 23-0217/Gomez Gonzalez)

26.     An order of removal was obtained by the U.S. government against Nery Osbeli Gomez Gonzalez for entering the United States illegally.

27.     After being removed from the United States, Gomez Gonzalez reentered the United States despite the prior order of removal.

28.     At or about the time that Gomez Gonzalez reentered the United States, his two children (Brithney Selina Gomez Perez and Henry Osbeli Gomez Perez) were in removal proceedings.

29.     Gomez Gonzalez hired Respondent on December 17, 2021, to assist him, his two children and his 18-year-old cousin (Cesar Ovidio Jacobo Agustin) with immigration matters and to defend them in removal proceedings.

   a.     The first engagement agreement between Respondent and Gomez Gonzalez set forth a fee of $21,000 to represent Gomez Gonzalez, his two children and his cousin and  noted that a new contract would be executed if and when Gomez Gonzalez was approved through the USCIS asylum vetting center.

30.    Gomez Gonzalez subsequently entered into another engagement agreement with Respondent regarding representation of him, his two children and his cousin.

      a.    Respondent's second engagement agreement stated in Spanish that (a) Respondent would represent Gomez Gonzalez and his two children regarding their asylum applications and his cousin regarding the filing of a petition for Special Immigrant Juvenile (SIJ) classification status; (b) the total fee for those services was a flat fee of $28,000; (c) the firm required a deposit of $500 before services would begin; (d) the deposit and other payments made by Gomez Gonzalez were non-refundable; and (e) the contract did not include representation in an appeal from an Immigration Judge's ruling.

31.    Respondent's second engagement agreement failed to advise Gomez Gonzalez that he could discharge Respondent and his firm at any time, in which case he may be entitled to a refund of all or part of the fee he had paid based upon the value of the representation. Gomez Gonzalez paid a total of $8,250 to Respondent.

32.    Respondent prepared and filed three I-589 "Application[s] for Asylum and for Withholding of Removal" (*Applications for Asylum*) on Gomez Gonzalez and his two children's behalf.

     a.    The *Applications for Asylum* prepared by Respondent were insufficient. For example, they failed to include briefing on complex issues of law, including the following:

         i.    Asylum has a one-year filing bar—one year after arrival in the United States—that can be overcome by only two exceptions: changed circumstances and extraordinary circumstances. On Gomez Gonzalez's *Application for Asylum*, Part C, Question 5, where an explanation can be given for why the filing was so far after the one-year deadline (more than 10 years in Gomez Gonzalez's case), Respondent included the following for Gomez Gonzalez's explanation: "i [sic] was not aware of the deadline[.]" Respondent failed to submit any evidence, any briefing or anything else.

33.    Respondent failed to retain signed copies of the *Applications for Asylum* before sending them to USCIS.

34.    On December 14, 2022, Respondent sent an email message to a government attorney requesting dismissal of the removal proceedings against Gomez Gonzalez's children.

35.    A master calendar hearing for Gomez Gonzalez's children was scheduled for December 15, 2022.

36.    When Gomez Gonzalez called Respondent's office to request representation at his children's master calendar hearing (which Respondent asserts was not within the scope of his representation at that time), Respondent informed him that Attorney Elizabeth Grant would appear at the hearing as a courtesy because Respondent was unavailable to appear on short notice. Respondent further advised Gomez Gonzalez that the hearing would likely be vacated once he signed into the case.

37.    Attorney Grant was initially scheduled to appear at the December 15, 2022 master calendar hearing on Respondent's behalf. Respondent anticipated that she would ask for dismissal at the hearing.

38.    On December 15, 2022, the Immigration Judge vacated the master calendar hearing shortly before it was scheduled to begin.

39.    Respondent or his office staff attempted to notify Gomez Gonzalez that the hearing had been vacated, but he did not answer his cell phone.

40.    On December 16, 2022, Respondent notified Gomez Gonzalez via text message that he was no longer representing him, his children and his cousin.

41.    On December 19, 2022, Respondent emailed to Gomez Gonzalez some of the documents comprising the file he maintained on Gomez Gonzalez and his children's behalf.

42.    USCIS received the three *Applications for Asylum* on December 23, 2021.

43.    Respondent performed no work on Gomez Gonzalez's cousin's case between February 2022 and December 2022.

44.    Respondent never prepared or filed in state court a petition for SIJ classification status for Gomez Gonzalez's cousin, a necessary predicate to filing his Form I-360 petition for SIJ classification.

45.    When Respondent discontinued representation of Gomez Gonzalez, his children and his cousin, he did not provide Gomez Gonzalez with a refund of any of the fees he had paid to Respondent.

46.    Respondent's file, which was eventually provided to Gomez Gonzalez or his subsequent counsel, included  eight documents: (a) three *Applications for Asylum* that had been filed for Gomez Gonzalez and his two children; (b) three receipts for the *Applications for Asylum* that had been filed; and (c) two biometrics documents for Gomez Gonzalez's two children.

47.    After Respondent discontinued representation of Gomez Gonzalez, his children and his cousin, they were represented by the Immigration Law Clinic at the University of California Davis School of Law ("UC Davis Law School Clinic"), which is overseen by Attorney/Professor Holly Cooper.

48.    During the first week of February 2023, Respondent communicated with the UC Davis Law School Clinic and was informed  that the Clinic had "a retainer to investigate potential forms of relief for the family."

49.    On February 8, 2023, two days after the Clinic informed Respondent that it had a "retainer to investigate potential forms of relief" for  Gomez Gonzalez, his children and his cousin, he filed motions to dismiss the removal proceedings against Gomez Gonzalez's children and cousin.

a.    Respondent failed to act diligently and failed to expedite litigation in the best interests of Gomez Gonzalez's children and cousin by waiting over a year to file the motions to dismiss the removal proceedings against them.

50.    The Immigration Court dismissed the removal proceedings against Gomez Gonzalez's children and cousin based on the motions filed by Respondent in February 2023.

51.    By engaging in the conduct set forth above, Respondent violated  8 CFR §§  1003.102(n),  1003.102(o),  1003.102(p),  1003.102(q),  1003.102(r)  and 1003.102(u); and, Arizona ERs 1.1, 1.2(a), 1.3, 1.4(a), 1.4(b), 1.5(d)(3), 3.2, and 8.4(d).

## COUNT THREE (File No. 23-1443/Pennington

52.    Luisa Pablo Perez ("Perez"), a citizen of Guatemala, applied for asylum for herself and her two children (Sergio Martin Pablo and Wuilliam (sic) Martin Pablo) based on (a) the persecution she suffered from—and fear of—her former partner; and (b) the persecution and fear she suffered from being an Indigenous Mayan Mam woman.

53.    Perez was not represented by counsel at her merits hearing in the Immigration Court in Detroit, Michigan.

54.    The assigned Immigration Judge denied Perez's *Application for Asylum*.

55.    On March 5, 2020, Perez hired Respondent to file an appeal brief with the Board of Immigration Appeals (BIA) for her and her two children.

       a.    Respondent's engagement agreement stated that (a) Respondent would represent Perez in her appeal of the Immigration Judge's denial of her *Application for Asylum*; (b) the total amount due for representation was $5,000; (c) the firm required a deposit of $1,500 before services would begin; and (d) the deposit was non-refundable.

       b.    Respondent's engagement agreement failed to advise Perez that she could discharge Respondent and his firm at any time, in which case she

may be entitled to a refund of all or part of the fee she had paid based upon the value of the representation provided.

56. On December 13 and 28, 2021, Respondent filed appellate briefs on Perez and her children's behalf with the BIA. Both briefs failed to thoroughly address all relevant matters and waived critical issues.

a. The briefs lacked analysis critical to Perez and her children's asylum claims.

b. The briefs consisted primarily of "boilerplate" language that waived highly meritorious challenges to dispositive issues that were addressed in the Immigration Judge's decision denying Perez and her children's applications for asylum.

c. Respondent's briefs waived any argument challenging the Immigration Judge's erroneous finding that Perez did not establish that Guatemalan authorities are unwilling or unable to protect her in Guatemala.

i. The Immigration Judge erroneously found that Perez did not establish that Guatemalan authorities were unable or unwilling to protect her in Guatemala, despite her attempt to report to the police a particularly vicious attack by her abuser.

ii.  The Immigration Judge's finding was clearly erroneous because Guatemalan authorities failed to investigate, prosecute or punish Perez's abuser, did not offer her any protection from him, and literally were unable to take a report of the incident due to a language barrier, which reflected their inability and unwillingness to protect her.

iv. The Immigration Judge further erroneously found that Country Condition Reports demonstrated that the Guatemalan government has devoted "significant resources" to combating gender-based violence.

vi.  The Country Condition Reports in Perez's case demonstrated the inadequacy and inefficacy of the government's response to the epidemic of gender-based violence in Guatemala. Furthermore, (a) the Country Condition Reports indicated there was a lack of investigation of and accountability for gender-based violence; (b) gender-based violence remained a widespread and serious problem in Guatemala; (c) the Guatemalan police had received minimal training and had minimal capacity to investigate sexual crimes or assist survivors; (d) the government did not enforce the law effectively; and (e) the police had been unresponsive to domestic violence complaints.

      d.     Respondent's briefs consisted of "boilerplate" language and was nearly devoid of specific references to Perez and her children's situations. Of the ten pages of argument in Respondent's December 13, 2021 brief, only three paragraphs explicitly referenced the facts regarding Perez's situation in Guatemala.

      e.     Respondent's brief referred to Perez in places using male pronouns and inaccurately recited the facts regarding Perez and her children's situation in Guatemala.

      f.     Respondent argued that Perez's membership in a PSG was based on the domestic violence she suffered, a claim that had been foreclosed by precedent at that time (but has since been reversed).

57.     Respondent failed to act with reasonable diligence and promptness in representing Perez and her children.

58.     Following Respondent's representation of Perez and her children, immigration attorney Alison Pennington, began representing them.

59.     Upon information and belief, Attorney Pennington, pursuant to *Matter of Lozado*, 19 I. & N. Dec 637 (BIA 1988), filed a motion with the BIA to remand Perez and her children's cases based on Respondent's ineffective assistance of counsel.

60.    In an order dated January 31, 2024, the BIA remanded Perez's matter based on the change in law identified in the appeal brief. The BIA expressly noted that it found it "unnecessary to decide" whether Mr. LaCome provided ineffective assistance of counsel because "whatever deficiencies might have occurred previously, if any, can be remedied by new counsel on remand, where the parties may update the record with relevant evidence and arguments."

By engaging in the conduct set forth above, Respondent violated 8 CFR §§ 1003.102(n), 1003.102(o), 1003.102(q) and 1003.102(u); and, Arizona ERs 1.1, 1.3 and 8.4(d).

## COUNT FOUR (File No. 23-3115/State Bar of Arizona)
### Matter Involving E-Y-V-V-[5]

61.    In or about 2021, Respondent agreed to represent E-Y-V-V- in his/her immigration proceedings.

62.    On March 10, 2021, E-Y-V-V- signed a declaration in which he/she stated he/she had been raped in 2015 by a co-worker.

---

[5] Respondent's former clients, when referenced in Counts Four through Nine, are referred to by their initials because the allegations were submitted by EOIR, which informed bar counsel that the clients' names should remain confidential; the former clients are also referred to as "he/she" and "him/her" for the same reason. The use of clients' initials is also consistent with EOIR citation guidelines.

63.    On July 20, 2021, Respondent entered his appearance as E-Y-V-V-'s attorney in his/her immigration proceedings.

64.    On August 30, 2021, E-Y-V-V-, through Respondent, submitted a declaration that stated that he/she had been raped by a former co-worker in the United States (it did *not* assert that he/she had been raped by gang members in El Salvador).

65.    On December 8, 2022, Judge Arwen Swink of the San Francisco Immigration Court issued a notice setting  E-Y-V-V's master calendar hearing via Webex on February 7, 2023.

The accompanying scheduling order contained boilerplate language directing Respondent and DHS to "**<u>confer</u>** regarding this case to explore the possibility of prosecutorial discretion and whether [the parties] intend to proceed to trial before the Court" and further encouraged the parties "to explore whether dismissal, administrative closure, or another course of action would accomplish similar goals." (Bold typeface and underline in original).

66.    On January 23, 2023, Respondent submitted a motion to vacate the master calendar hearing scheduled for February 7, 2023 in which he informed Judge Swink that he had filed a Form I-589 Application for Asylum and for Withholding of Removal and other documents on E-Y-V-V-'s behalf.

On February 6, 2023, Judge Swink issued an order granting Respondent's motion to vacate the master calendar hearing which stated, "Respondent has declined the opportunity to narrow issues, confirm biometrics results, and otherwise confer at the special Master hearing" and confirmed that E-Y-V-V-'s individual merits hearing remained set for March 2, 2023.

67.    On February 7, 2023, Respondent filed a prehearing brief on E-Y-V-V-'s behalf.

a.    The brief provided an overview of E-Y-V-V-'s claim that he/she feared returning to El Salvador because he/she had received threats from gang members after his/her spouse engaged in an extramarital affair with a person who had familial gang ties.

b.    In the narrative section of the brief, Respondent stated that after E-Y-V-V- entered the United States, he/she was raped by a co-worker in 2015, and that his/her rapist used his/her immigration status as a threat to silence him/her; that argument differed from the argument section of the brief, wherein Respondent stated that E-Y-V-V- should be granted relief because he/she "suffered past persecution at the hands of gang members who beat [him/]her, and forcibly raped [him/]her."

68.    Also on February 7, 2023, Respondent filed a document titled "Particular Social Group Statement" ("PSG Statement"), which stated that        E-Y-V-V- is a member of five Particular Social Groups ("PSGs").

a.    Each proposed PSG was defined by the harm, which is not legally permissible.

b.    Respondent's PSG Statement made arguments that were legally foreclosed.

c.    After each PSG, Respondent cited to one or more decisions from the U.S. Attorney General, the Board of Immigration Appeals ("BIA"), or a Circuit Court of Appeals implying that the proposed PSG was supported by published case law.

d.    At least some of the case law referenced by Respondent regarding the PSGs did not support the proposition for which he had cited the case law.

69.    On March 2, 2023, E-Y-V-V- appeared with Attorney Niloufar Mazhari at his/her individual hearing before Judge Swink.

a.    Judge Swink asked Attorney Mazhari whether the claim Respondent made in his prehearing brief that E-Y-V-V- had been raped by gang members in El Salvador was accurate and Attorney Mazhari responded

that the statement was incorrect because E-Y-V-V- alleged he/she had been raped by a co-worker in the United States.

    i.     Respondent admits that the brief inadvertently erroneously stated that E-Y-V-V- was raped by gang members in El Salvador and that the brief should have stated that E-Y-V-V- "suffered past persecution at the hands of gang members who beat [him/]her, and a co[-]worker who forcibly raped [him/]her."

    ii.    Respondent claimed the prehearing narrative came directly from E-Y-V-V-'s I-589 declaration, and that the error resulted from an inaccurate translation of the  declaration (he said E-Y-V-V-'s declaration "at times when translated does not translate word for word[,] making it difficult to discern what [E-Y-V-V-] is attempting to convey").

    b.    Judge Swink also raised concerns about Respondent's PSG Statement because each proposed PSG was defined by the harm, which is not legally permissible.

    c.    Judge Swink also found that Respondent's PSG Statement made arguments that were legally foreclosed, but that Respondent nonetheless cited

case law to make it appear as if his propositions had legal support when in fact they did not.

        d.    During the hearing, Attorney Mazhari asked to continue E-Y-V-V-'s case so that Respondent could file a request for prosecutorial discretion.

        e.    DHS counsel indicated that the government may favorably exercise prosecutorial discretion if E-Y-V-V- could provide additional documentary evidence in conjunction with the new request.

        f.    Although Judge Swink found that Respondent previously declined the opportunity to discuss prosecutorial discretion at the master calendar hearing he moved to vacate, Judge Swink nevertheless granted Attorney Mazhari's continuance request because it appeared that E-Y-V-V- was eligible for prosecutorial discretion.

70.    By engaging in the conduct set forth above, Respondent violated 8 C.F.R. §§ 1003.102(n), 1003.102(o), 1003.102(q); and, Arizona ERs 1.1, 1.3, 3.1 and 8.4(d).

### COUNT FIVE (File No. 23-3115/State Bar of Arizona)
#### Matter Involving E-E-P-R

71.    In or about November 2022, Respondent agreed to represent E-E-P-R- in his/her immigration proceedings.

72.    On November 16, 2022, Respondent entered his appearance as the primary attorney for all immigration proceedings in E-E-P-R-'s case.

73.    On Friday, December 9, 2022, Attorney Mary Grant appeared via Webex on Respondent's behalf at E-E-P-R-'s scheduled hearing before Immigration Judge Kenya Wells at the Houston Greenspoint Park Immigration Court in Houston, Texas.

    a.    At the conclusion of the hearing, Judge Wells instructed Attorney Grant to file E-E-P-R-'s application for asylum before the end of the following business day.

    b.    Judge Wells also scheduled E-E-P-R's individual merits hearing on June 13, 2023, and ordered that all evidence be filed no later than April 13, 2023.

74.    On Tuesday, December 13, 2022, Respondent filed a Form I-589 Application for Asylum and for Withholding of Removal on E-E-P-R-'s behalf.

    a.    E-E-P-R- alleged that the "signature" on the Application for Asylum was not placed on the Application by E-E-P-R-, and he/she had not authorized anyone to sign it on his/her behalf.

      b.    Respondent filed the Application for Asylum knowing that the signature on the document was not placed by E-E-P-R-, and signed the application adjacent to text stating that the client signed in his presence.

75.    On June 5, 2023 (53 days later than ordered by Judge Wells), Respondent attempted to file multiple documents, including a Human Rights Watch report, a prehearing brief, numerous identity documents, proof of biometrics, and a witness list.

76.    Later on June 5, 2023, the Immigration Court issued a "REJECTED FILING NOTICE TO ATTORNEY OR REPRESENTATIVE," stating that Respondent's filings had been rejected and noted that "[n]o motion to accept late filings [had been] attached"; the rejection notice directed Respondent to refile those documents with the proper motion attached.

77.    On June 6, 2023, Respondent filed multiple motions titled "MOTION TO ACCEPT LATE FILING."

      a.    Those motions were identical and stated: "Due to the holiday weekend, the filing of these documents was one day late of the filing deadline and was rejected in part due to clerical error. The documents are vital to [E-E-P-R-] for corroboration purposes."

78.    On June 7, 2023, Judge Wells issued a written order denying Respondent's motions.

    a.    That written order stated: "[The Court] set a deadline for evidence to be filed by April 13, 2023. Contrary to Respondent's claim, the late-filed documents were not one day late. Respondent has not established good cause for why the items were filed beyond the filing deadline."

79.    Despite Judge Wells' December 9, 2022 order, on June 12, 2023, one day before E-E-P-R-'s individual hearing, Respondent again filed multiple motions titled "MOTION TO ACCEPT LATE FILING."

    a.    Those motions were identical to those he had previously filed on June 6, 2023.

80.    Judge Wells did not rule on those motions prior to E-E-P-R-'s individual merits hearing.

81.    On June 13, 2023, E-E-P-R- and Attorney Mariana Ehrenberg appeared at E-E-P-R-'s scheduled individual merits hearing before Judge Wells.

    a.    Counsel for DHS informed Judge Wells that E-E-P-R- had filed a request for prosecutorial discretion on June 6, 2023 and requested additional time to review the request.

b.     Judge Wells stated that he had ordered that all evidence and joint motions be filed on or before April 13, 2023, and saw "no reason why [the prosecutorial discretion request] was not done at an earlier time."

c.     Judge Wells deemed Respondent's request for prosecutorial discretion untimely.

d.     Attorney Ehrenberg interjected, stating that she was under the impression that all filings in E-E-P-R-'s case were timely filed.

e.     Judge Wells indicated to Attorney Ehrenberg that she was mistaken and pointed out that Respondent had previously filed multiple motions requesting that the Court accept late-filed evidence and that the earliest of those motions, dated June 6, 2023, incorrectly claimed that the evidence was submitted "one day late."

f.     Judge Wells indicated to Attorney Ehrenberg that he had previously issued an order denying Respondent's untimely motions because he had ordered Respondent, at a master calendar hearing on December 9, 2022, to file all evidence on or before April 13, 2023.

g.     In response, Attorney Ehrenberg stated that the file that Respondent had provided to her did not include various documents and indicated that she was not certain she would have agreed to appear on

Respondent's behalf if she had known about the Court's December 9, 2022 order, Respondent's failure to timely file evidence, and/or Judge Wells' denial of Respondent's motions for the Court accept late-filed evidence.

      i.   Respondent failed, prior to E-E-P-R-'s individual merits hearing, to provide Attorney Ehrenberg with copies of all documents related to E-E-P-R-'s matter.

h.    Attorney Ehrenberg informed Judge Wells that Respondent informed her the night before the hearing that everything had been filed.

i.    Upon questioning by Judge Wells, Attorney Ehrenberg clarified that she did have a copy of the Form I-589, but that the copy in her file was not signed by E-E-P-R.

j.    Judge Wells stated that the copy of the Form I-589 in the Court's file was signed by E-E-P-R.

k.    Attorney Ehrenberg stated that she needed time to sort out the mess and indicated that was necessary because it appeared she was not properly informed about the status of the case.

l.    Judge Wells denied Attorney Ehrenberg's oral motion to continue E-E-P-R-'s individual merits hearing.

m.    Judge Wells asked Attorney Ehrenberg if she wanted to contact Respondent but she stated she believed that Respondent was out of town and that is why he had asked her to appear on his behalf.

n.    Judge Wells proceeded with E-E-P-R-'s hearing.

o.    Judge Wells orally denied Respondent's June 12, 2023 motions to accept late filings, finding that the motions were filed well after the deadline and that Respondent had not provided a reason to excuse his untimeliness.

p.    Judge Wells asked E-E-P-R- questions about his/her Application for Asylum and allowed E-E-P-R- to review the Court's copy of the Form I-589 Application for Asylum that Respondent had filed.

q.    Upon examining the Court's copy of the Form I-589, E-E-P-R- told Judge Wells that the signature on the application that Respondent had filed was not his/hers.

r.    In support of his/her claim, E-E-P-R- showed Judge Wells a copy of Respondent's representation agreement, which E-E-P-R- claimed he/she had previously signed and informed Judge Wells that the signatures did not match.

s.    Judge Wells compared E-E-P-R-'s signature on Respondent's representation agreement, which included an affirmation under oath that it

was his true signature, with E-E-P-R-'s alleged signature on the Form I-589
Application for Asylum and noted his belief that the signatures did not match.

t.    When Judge Wells asked E-E-P-R- whether he had granted
anyone permission to sign the Form I-589 Application for Asylum on his
behalf, E-E-P-R- responded, "No."

u.    At the conclusion of the hearing, Judge Wells granted Attorney
Ehrenberg's request for a dismissal without prejudice based on prosecutorial
discretion, which E-E-P-R informed Judge Wells was the outcome he wanted.

82.    By engaging in the conduct set forth above, Respondent violated 8
C.F.R. §§ 1003.102(n), 1003.102(o) 1003.102(q) and Arizona ERs 1.1. 1.2(a), 1.3,
3.3(a), and 8.4(d).

## COUNT SIX (File No. 23-3115/State Bar of Arizona)
### Matter Involving R-M-M-C

83.    In or about June 2023, Respondent agreed to represent R-M-M-C- in
his/her immigration proceedings.

84.    On June 24, 2023, Respondent entered his appearance as the primary
practitioner of record for R-M-M-C- in all of his/her immigration proceedings.

85.    The Immigration Judge ordered the parties to file all evidence on or
before July 18, 2023.

86.     On several dates in August 2023 and on September 1, 2023, Respondent filed various documents on R-M-M-C-'s behalf, including country condition reports, an I-589 Application for Asylum, passports and other identification documents, a supporting declaration, a prehearing statement, and an updated PSG statement.

87.     On September 4, 2023 (Labor Day), the day before R-M-M-C-'s scheduled 8:30 a.m. individual merits hearing, Respondent submitted six additional evidentiary exhibits including judicial orders, a police report, medical documents and a notification from a prosecutor's office. Respondent electronically served copies of the exhibits on DHS's Office of Chief Counsel through the EOIR Courts & Appeals System (ECAS[6]).

88.     Also on September 4, 2023, Attorney Niloufar Mazhari entered her appearance as a "Non-Primary Attorney/Representative."

89.     On September 5, 2023, the day of R-M-M-C-'s individual hearing, Respondent filed two motions to accept late filings, which were filed less than 20 minutes apart.

---

[6] ECAS is the acronym for the EOIR Courts & Appeals System, which retains all records and case-related documents in electronic format.

     a.    The first motion to accept late filings stated: "[R-M-M-C-] requests that the court accepts [sic] the following late filed documents. These documents are vital to [R-M-M-C-]'s case for corroboration purposes."

     b.    The second motion stated:

> [R-M-M-C-] requests that the court accepts [sic] the following late[-]filed documents. These documents are vital to [R-M-M-C-]'s case for corroboration purposes. [R-M-M-C-] did not provide several pieces of evidence to counsel until yesterday[,] on September 4, 2023, which were then uploaded to [the] EOIR case portal that same day. [. . .] Counsel has also received one other piece of evidence, a police report, this morning[,] on September 5, 2023, which counsel is now submitting to [the] EOIR case portal.

90.    A few minutes after filing the second motion to accept late filings, Respondent uploaded a police report to the Immigration Court and DHS counsel.

91.    Also on September 5, 2023, Attorney Mazhari appeared on Respondent's behalf to represent R-M-M-C- at his/her individual merits hearing.

     a.    During direct examination of R-M-M-C- by Attorney Mazhari, Attorney Mazhari identified a document that was not in the evidentiary record.

     b.    Immigration Judge Seminerio realized that the document that Attorney Mazhari had referenced had been submitted the day before, which was a holiday, and had not yet been added to the Court's electronic file.

c.     Judge Seminerio asked Attorney Mazhari why that document had not been timely filed.

d.     Attorney Mazhari stated she did not file them and did not know why the documents were filed late.

e.     Upon further inquiry by Judge Seminerio, Attorney Mazhari blamed her paralegal, who had recently resigned, for the late filings.

f.     Judge Seminerio then took a brief recess so the attorney representing DHS could review the documents.

g.     Judge Seminerio explained to R-M-M-C- that the Court had not yet reviewed some of his/her evidence because Respondent submitted it the day before the hearing.

h.     The attorney representing DHS then requested an additional 25-minute recess to review the documents, which the court granted.

i.     After returning from the recess, Attorney Mazhari notified Judge Seminerio that there was another late-filed exhibit that had not yet been added to the record, which  included two photographs of a police report that were taken with a cell phone.

j.     The timestamp on the submission indicated that Respondent's office submitted the exhibit while the hearing was underway.

k.    The attorney representing DHS objected on timeliness grounds to the admission of the documents filed on September 4 and 5, 2023.

l.    Judge Seminerio agreed that the documents were not timely filed, but admitted the documents for the Court's consideration.

92.    By engaging in the conduct set forth above, Respondent violated 8 C.F.R. §§ 1003.102(n), 1003.102(q); and, Arizona ERs 1.3  and 8.4(d).

## COUNT SEVEN (File No. 23-3115/State Bar of Arizona)

### Matter Involving G-A-T

93.    G-A-T- was involved in immigration proceedings.

94.    On March 26, 2021, the Immigration Court issued a "NOTICE OF HEARING IN REMOVAL PROCEEDINGS," which scheduled G-A-T-'s individual merits hearing for May 2, 2023.

95.    In or about September 2021, Respondent agreed to represent G-A-T- in his/her immigration proceedings.

96.    On or about September 20, 2021, Respondent entered his appearance as the primary practitioner of record in G-A-T-'s case.

97.    On May 2, 2023, Attorney Reshma Kamath appeared via Webex for Respondent on G-A-T-'s behalf at his/her individual merits hearing. However,

Attorney Kamath had failed to file a Notice of Appearance as G-A-T-'s non-primary attorney.

b.     Attorney Kamath   requested a continuance of G-A-T-'s individual hearing.

c.     Immigration Judge Amber George explained to Attorney Kamath that she needed to enter her appearance before she could represent G-A-T.

d.     Judge George disconnected Attorney Kamath from the Webex proceeding and called Respondent on the record.

e.     Respondent answered the telephone, at which time Judge George explained that she had dismissed Attorney Kamath because she had failed to file the requisite notice of appearance.

f.     Judge George also informed Respondent that he should have filed a motion to continue prior to the hearing, rather than sending substitute counsel to request a continuance.

g.     Judge George also noted that she had previously informed Respondent that he or another attorney appearing on his behalf had to appear in person at hearings and that she expected him to appear in person for future hearings.

h.    Respondent then requested a continuance, citing the need to obtain important records related to G-A-T-'s criminal history, which could impact his/her eligibility for relief.

i.    Judge George granted Respondent's continuance request and rescheduled G-A-T-'s hearing for September 5, 2023.

j.    Judge George also ordered Respondent to file a brief on or before July 31, 2023, detailing G-A-T-'s criminal history and its effect on his/her eligibility for relief.

98.    Respondent did not file a detailed brief on or before July 31, 2023.

a.    Respondent elected not to file a detailed brief analyzing crime factors, as ordered by Judge George, because he perceived that issue would become moot (*i.e.*, he believed a state court would grant a request to vacate G-A-T-'s criminal convictions, which had been filed by G-A-T-'s criminal defense attorney, prior to the next Immigration Court hearing, thereby making "moot" whether G-A-T-'s crimes qualified as "particularly serious").

99.    On August 15, 2023, in an effort to keep Judge George updated regarding the status of G-A-T-'s criminal issue, Respondent filed a copy of a Notice of Motion and Motion to Vacate Conviction, which G-A-T-'s criminal defense

attorney had filed on July 31, 2023, the deadline for Respondent to submit briefing on the criminal conviction issue.

100.   Although Judge George had directed Respondent to appear in person for the next hearing, Respondent filed a motion on August 18, 2023, requesting permission to appear virtually, which Judge George denied.

101.   Respondent untimely filed several documents with the Immigration Court on G-A-T-'s behalf, none of which complied with Judge George's order to submit a brief explaining the effects that G-A-T-'s criminal history could have on his/her eligibility for relief.

102.   On August 18, 2023, Respondent filed a criminal history chart for  G-A-T.

103.   On or about August 30, 2023, Respondent filed an update regarding the motion to vacate G-A-T-'s conviction, informing the Immigration Court that the motion was unopposed and had been granted.

104.   On August 31, 2023, Respondent filed a motion seeking to withdraw G-A-T-'s admission that he/she is removable and to terminate proceedings based on an allegedly defective notice to appear issued in February 2013; Respondent cited recent changes in the law regarding the sufficiency of notices to appear.

105.   On September 1, 2023, Respondent filed an updated criminal history chart for G-A-T.

106.   Respondent failed to appear for G-A-T-'s hearing on September 5, 2023.

    a.   Respondent's office contacted the Immigration Court to inform the judge and her staff that Respondent was still in a hearing in a different courtroom and would be late.

        i.   Judge George indicated she would likely be unable to begin the hearing until at least 11:30 a.m.

        ii.   At 12:05 p.m., Judge George inquired what happened to Respondent or his office.

        iii. Judge George called Respondent on the record but was unable to reach him.

        iv. Judge George again rescheduled G-A-T-'s hearing and issued a corresponding hearing notice.

            (a)   The hearing notice, dated September 5, 2023, stated that Respondent twice failed to appear for hearings; that notice rescheduled G-A-T- for a new master calendar hearing on April 1, 2024.

(b)  The hearing notice reiterated Judge George's prior order that Respondent could no longer appear for hearings via Webex.

v.    Attorney Mazhari, who was going to appear on Respondent's behalf due to his other commitments, proceeded to Judge George's courtroom at the conclusion of a hearing she had been attending, but was informed that a complaint had already been submitted to EOIR.

107.  On September 7, 2023, Judge George issued an order denying Respondent's motion to terminate proceedings, citing his failure to appear for two hearings on the merits; Judge George's order advised G-A-T- to "seek other counsel due to ineffective assistance of counsel."

108.  By engaging in the conduct set forth above, Respondent violated 8 C.F.R. §§ 1003.102(k), 1003.102(n), 1003.102(o), 1003.102(q); and, Arizona ERs 1.1, 1.3, 3.4(c)and 8.4(d).

### COUNT EIGHT (File No. 23-3115/State Bar of Arizona)
### Matter Involving M-E-A-M

109.  In or about December 2021, Respondent agreed to represent  M-E-A-M- in his/her immigration proceedings.

110.    On December 17, 2021, Respondent entered his appearance as the "Primary Attorney/Representative" of record for M-E-A-M- for all proceedings in his/her removal/asylum/Convention Against Torture proceeding.

111.    On July 1, 2022, Attorney Niloufar Mazhari entered her appearance as M-E-A-M-'s "non-Primary Attorney/Representative."

112.    Attorney Mazhari appeared on M-E-A-M-'s behalf at his/her hearing on July 1, 2022.

a.    At that hearing, Immigration Judge Andrew Caborn issued an oral decision denying M-E-A-M-'s application for relief and ordered him/her removed from the United States.

b.    Judge Caborn made several key findings in his decision to support the denial of relief: he found that M-E-A-M- did not suffer past persecution, that he/she could safely relocate within his/her native country, and that the three Particular Social Groups that Respondent argued on his/her behalf were not cognizable under immigration law.

113.    On July 6, 2022, Respondent entered his appearance before the Board of Immigration Appeals (BIA).

114.    Also on July 6, 2022, Respondent filed a Notice of Appeal from a Decision of an Immigration Judge based on Judge Caborn's July 1, 2022 decision.

115.   On August 1, 2022, Judge Caborn issued a written decision based on his earlier oral decision.

116.   On August 15, 2023, the BIA issued a briefing schedule that directed Respondent to file his appeal brief on or before September 5, 2023.

117.   On August 28, 2023, Respondent filed a 27-page opening brief on  M-E-A-M-'s behalf.

a.    A large portion of the brief simply recounted Judge Caborn's decision, much of which was copied from the decision verbatim, and much of the remainder of the brief consisted of long recitations of black letter law, followed by short legal conclusions that were unsupported by any factual and legal analysis relevant to M-E-A-M-'s situation.

b.    The brief failed to meaningfully address key findings included in Judge Caborn's decision.

i.    For example, Judge Caborn found that M-E-A-M- did not suffer past persecution and that he/she could safely relocate within his/her native country of Honduras to avoid the people he/she had alleged wished to do him/her harm.

ii.    In support of that finding, Judge Caborn specified that no one ever actually harmed M-E-A-M-, that he/she had not seen or heard from

anyone who wished to do him/her harm, that the issue appeared to be local in nature, and that he/she was able to live with a friend in Honduras without incident.

iii.  Respondent failed to meaningfully address Judge Caborn's factual and legal findings or analysis, and simply made conclusory statements such as "[M-E-A-M-'s] ordeal is the epitome of persecution" and "the police have been unwilling or unable to help in preventing or reducing this persecution.

iv.  Respondent's brief also failed to meaningfully address Judge Caborn's finding that the three Particular Social Groups (PSGs) he had argued were not cognizable.

(a)  The brief contained long recitations of black letter law, but did not explain how that law applied to the three PSGs that were included in M-E-A-M-'s Application for Asylum and failed to show that Judge Caborn's analysis was erroneous.

(b)  The brief also included a section that argued that the government in M-E-A-M-'s native country of Honduras was unwilling or unable to control those who allegedly wished to

persecute M-E-A-M-; Judge Caborn's decision had not addressed that issue.

118. On November 3, 2023, the BIA affirmed Judge Caborn's decision without opinion (pursuant to 8 C.F.R. § 1003.1(e)(4)).

119. By engaging in the conduct set forth above, Respondent violated 8 C.F.R. §§ 1003.102(n), 1003.102(o) and 1003.102(q); and, Arizona ERs 1.1, 1.3, 3.1 and 8.4(d).

## COUNT NINE (File No. 23-3115/State Bar of Arizona)
### Matter Involving I-O-M-B

120. On or about July 29, 2021, I-O-M-B- and R-E-V-M-, his/her minor daughter, both Honduran citizens, entered the United States without proper documentation or an immigration officer's permission.

121. On November 16, 2021, the Department of Homeland Security (DHS) initiated removal proceedings against I-O-M-B- and his/her daughter by filing Notices to Appear with the San Francisco Immigration Court.

122. On January 12, 2022, the Immigration Court informed I-O-M-B- that his/her master calendar hearing was scheduled for April 20, 2022.

123. In or about January 2022, Respondent agreed to represent I-O-M-B- and his/her daughter.

124.    On or about January 29, 2022, Respondent entered his appearance as a "Primary Attorney/Representative" of record for I-O-M-B- and his/her daughter.

125.    Also on January 29, 2022, Respondent filed a Form I-589 Application for Asylum and for Withholding of Removal on I-O-M-B- and his/her daughter's behalf.

126.    On April 20, 2022, Respondent filed a 2021 Human Rights Report for Honduras.

Also on April 20, 2022, Attorney Mary Grant filed a notice of appearance and appeared at I-O-M-B-'s hearing in the removal proceeding.

    a.    During that hearing, Attorney Grant admitted all allegations against I-O-M-B-, conceded the charges of removability, declined to designate a country of removal, and stated she did not know whether I-O-M-B- had received instructions regarding the required submission of his/her biometrics.

127.    On April 20, 2022, Immigration Judge Susan Phan issued a hearing notice scheduling I-O-M-B- and his/her daughter's individual merits hearings for June 9, 2022.

128.    On May 3, 2022, the Immigration Court again notified Respondent that I-O-M-B- and his/her daughter's individual merits hearings were scheduled for June 9, 2022 (that notice corrected I-O-M-B-s' daughter's name).

129.    On May 12, 2022, Respondent filed I-O-M-B-'s asylum declaration and Notice of Completed Biometrics with the Immigration Court.

130.    On May 24, 2022, Respondent filed  a pre-hearing brief on I-O-M-B-'s behalf and a Particular Social Group (PSG) Statement that identified three PSGs in support of I-O-M-B-'s application for asylum.

131.    On June 9, 2022, Attorney Niloufar Mazhari entered her appearance as a "Non-Primary Attorney/Representative" for I-O-M-B.

132.    Also on June 9, 2022, Attorney Mazhari appeared at I-O-M-B- and his/her daughter's individual merits hearing.

133.    On June 15, 2022, Judge Phan issued a written decision denying  I-O-M-B and his/her daughter's applications for relief and protection under the Convention Against Torture, and ordered them removed from the United States to Honduras.

> i.    Judge Phan found, among other things, that I-O-M-B- had not suffered past persecution at the hands of gang members, that the five PSGs that he/she had alleged were not cognizable under immigration law, that any harm he/she suffered was not based on a protected ground, and that his/her opposition to gangs did not constitute a political opinion.

ii.   Judge Phan also found that Respondent's reliance on the State Department's Human Rights Report, the only country conditions evidence he submitted, did not sufficiently establish each of the proposed social groups as socially distinct within Honduran society or establish that I-O-M-B- and his/her daughter had "credible, direct, and specific" threats of harm if they were to be returned to Honduras.

134.   On July 2, 2022, Respondent filed a Form EOIR-27 Notice of Appeal on I-O-M-B-'s behalf.

135.   On July 11, 2022, Respondent filed two notices of appearance before the Board of Immigration Appeals (BIA).

136.   Also on July 11, 2022, Respondent filed a Form EOIR-26 Notice of Appeal from a Decision of an Immigration Judge.

a.   Section 6 of the Notice of Appeal requested detailed reasons for the appeal; Respondent simply wrote: "The IJ erred in denying [I-O-M-B-]'s APPLICATION FOR ASYLUM. [I-O-M-B-] requests a scheduling order."

137.   On August 27 or 28, 2023, Respondent timely filed a 27-page opening brief with the BIA.

a.   The brief failed to meaningfully address key findings in Judge Phan's decision; a large portion of the brief was copied verbatim from Judge

Phan's decision, but Respondent failed to note that was the case by failing to use quotation marks.

      b.    The brief also contained sections that were erroneously copied from another client's case, which resulted in inaccurate information being submitted to the BIA.

          i.    For example, the brief stated that I-O-M-B- feared for his/her safety and returning to Honduras because he/she had injured a gang member when the gang or a gang member attempted to extort his/her boss (that false and erroneous claim was copied from an appeal brief that Respondent filed for M-E-A-M).

          ii.  Large sections of the brief consisted of long recitations of black letter law followed by short legal conclusions that were unsupported by any factual or legal analysis relevant to I-O-M-B-'s situation, and Respondent failed to identify how Judge Phan's factual and legal findings were in error.

          iii. In his/her Application for Asylum and during his/her testimony, I-O-M-B- claimed that gang members had killed his/her former partner and members of his/her former partner's family; he/she

further alleged that he/she paid extortion money to the gang so that he/she could run a transportation business.

138.    On November 8, 2023, the BIA issued a decision dismissing I-O-M-B-'s appeal.

a.    The BIA's decision stated that the Notice of Appeal contained only "a broad allegation of error" and did not "provide any meaningful or persuasive arguments that establish error."

b.    The BIA also noted that the brief copied verbatim (and without quotation marks) large sections of Judge Phan's decision with respect to her findings of fact and analysis and contained "alleged facts [that] bear no reasonable resemblance to the claim set forth in [I-O-M-B-'s] case," which the BIA attributed to "scrivener's error."

c.    The BIA further found that Respondent waived numerous arguments because the brief failed to "provide any meaningful or persuasive arguments that establish error in the Immigration Judge's decision" and "d[id] not meaningfully challenge the Immigration Judge's findings or any legal conclusions with respect to [I-O-M-B-'s] proposed particular social groups,[ ] anti-gang political opinion, nexus, past persecution, well-founded fear[,] and clear probability of future persecution."

d.     The BIA additionally found that Respondent failed to "meaningfully challenge the denial of [I-O-M-B-'s] request for protection under the [United Nation's Convention Against Torture]."

139.   By engaging in the conduct set forth above, Respondent violated 8 C.F.R. §§ 1003.102(n), 1003.102(o) and 1003.102(q); and, Arizona ERs 1.1, 1.3, 3.1 and 8.4(d).

## COUNT TEN (File No. 24-0602/Orozco Guzman)

140.   On or about August 19, 2021, Wilfido Manfredo Orozco Guzman, his wife (Heilin Marisol Godoy Sarmiento) and his son (Liam Emiriel Orozco Godoy) entered the United States without inspection (*i.e.*, without presenting themselves in person to an immigration officer at a U.S. port of entry).

141.   In March 2022, Orozco Guzman hired Respondent to represent him, his wife and his son regarding asylum claims they wished to assert, which was to include the filing of a Form I-589 Application for Asylum and for Withholding of Removal with the Immigration Court.[7]

---

[7] Allegations regarding acts specifically undertaken on Orozco Guzman's behalf also pertain, where appropriate, to acts undertaken on his wife and son's behalf.

142.   Orozco Guzman agreed to pay a total fee of $8,000; he made an initial payment of $1,000, and then made monthly payments of $500 in April, May and June 2022 (for a total of $2,500).

143.   Orozco Guzman sought asylum and withholding of removal from the United States based on race, nationality, political opinion, membership in a particular social group ("PSG") and the United Nations' Convention Against Torture.

144.   Respondent filed "[Orozco Guzman]'s Asylum Declaration," on September 6, 2022.

145.   On March 18, 2022, Respondent filed with the Immigration Court an I-589 Application for Asylum and a Supplement B thereto on Orozco Guzman's behalf.

146.   Respondent submitted a single "Human Rights Report" for Guatemala for 2021 in support of Orozco Guzman's I-589 Application for Asylum.

147.   Orozco Guzman participated in  a telephone conversation with a nonlawyer employed by Respondent to prepare a declaration to be submitted with Orozco Guzman's I-589 Application for Asylum.

   a.   The declaration based on that conversation was written in English, but because Orozco Guzman did not speak English, he trusted

Respondent's office to accurately state in English what his staff stated to him in Spanish would be placed on the I-589 Application for Asylum.

148.   Orozco Guzman learned after the I-589 Application for Asylum and declaration were filed that they contained errors and were incomplete (*e.g.*, the Application for Asylum failed to include important information about his eligibility for asylum and failed to note that his grandmother was of the Mopan ethnic group).

149.   A few days prior to a hearing, Respondent's staff informed Orozco Guzman that if he did not pay the balance of the fee he owed pursuant to the terms of his engagement agreement, Respondent would withdraw as his attorney.

   a.   A day prior to a hearing, Orozco Guzman received a telephone call from Attorney Mary Grant, an attorney that periodically appeared on Respondent's behalf at his clients' immigration hearings.

   b.   Attorney Grant informed Orozco Guzman that she worked with Respondent's law firm and would appear on his behalf at his hearing the next day.

150.   On May 19, 2022, Attorney Grant appeared at Orozco Guzman's master calendar hearing.

151.   Following that master calendar hearing, Attorney Grant sent a message to Respondent informing him that she  "entered the standard pleadings."

b.      Attorney Grant also informed Respondent that Orozco Guzman's case was set for an individual merits hearing on September 14, 2022.

c.      Attorney Grant asked Respondent to provide Orozco Guzman with instructions about providing his biometrics and to warn him of the consequences of failing to comply with those instructions.

d.      Attorney Grant's message then stated:

Please also warn the clients of the consequences of failing to appear for the next hearing. The minor's presence is waived. The Judge will issue a prehearing order. Please look for it on ECAS.[8]

152.    In or about July 2022, Orozco Guzman stopped making periodic fee payments to Respondent because he was unhappy with his representation.

153.    On August 23, 2022, Respondent filed a six-page prehearing brief on Orozco Guzman's behalf.

154.    On August 31, 2022, Respondent sent Orozco Guzman a letter thanking him for choosing his firm to represent him, but noting that he could not represent him at his individual hearing, where the merits of his claim were to be addressed, unless he paid the outstanding balance of his fee (at that time, Orozco Guzman still owed $5,500 of the fee he had agreed to pay); Respondent invited Orozco Guzman

---

[8] ECAS is the acronym for the EOIR Courts & Appeals System, which retains all records and case-related documents in electronic format.

to contact his firm by telephone or email if he had any questions or to discuss his case.

155.   Approximately 20 days prior to the individual merits hearings for Orozco Guzman, his wife and his son, Respondent's office contacted Orozco Guzman and told him that he needed to collect evidence for the hearing.

156.   On September 14, 2022, Respondent appeared for Orozco Guzman, his wife and his son's individual hearings.

    a.    Respondent orally moved to withdraw as counsel based on Orozco Guzman's failure to pay his fee, as set forth in his engagement agreement.

    b.    The Immigration Judge granted Respondent's motion to withdraw, noting that "[Orozco Guzman] wishes to terminate the attorney-client relationship as well."

157.   Respondent did not provide  Orozco Guzman with a refund of any of the fee he had paid.

158.   After the Immigration Judge permitted Respondent to withdraw as counsel for Orozco Guzman, his wife and his son, they obtained another immigration attorney to represent them.

159.    Orozco Guzman, his wife and his son's subsequent counsel corrected documents prepared by Respondent or his staff and resubmitted them to the Immigration Court due to errors and/or omissions made by Respondent or his staff.

160.    By engaging in the conduct set forth above, Respondent violated 8 CFR §§ 1003.102(n), 1003.102(p), 1003.102(q), 1003.102(r);and, Arizona ERs 1.2(a), 1.3, 1.4(a) and (b),   and 8.4(d).

## CONDITIONAL ADMISSIONS

Respondent's admissions are being tendered in exchange for the form of discipline stated below and are submitted freely and voluntarily and not as a result of coercion or intimidation. Respondent conditionally admits that he violated 8 CFR §§ 1003.102(k), 1003.102(n), 1003.102(o), 1003.102(p), 1003.102(q), 1003.102(r), 1003.102(u) and 1003.102(v); and, Arizona ERs 1.1, 1.2(a), 1.3, 1.4(a), ER 1.4(b), ER 1.5(d)(3), 3.1, 3.3(a), 3.4(c),  and 8.4(d).

## CONDITIONAL DISMISSALS

The State Bar has conditionally agreed to dismiss the following file numbers for which no probable cause order has been entered: Nos. 24-2193, 24-2264 and 24-2989. The State Bar has also conditionally agreed to dismiss the allegations that Respondent violated 8 CFR §§ 1003.102(a)(1), (c), (j), and (l), Arizona Ethical Rules 1.5(a), 1.16(d), 4.1(a), 5.1, 5.3, 8.1(a), 8.4(c), and Rule 54(c), Ariz. R. Sup. Ct.

## RESTITUTION

Restitution is not an issue in this matter.

## SANCTION

Respondent and the State Bar of Arizona agree that based on the facts and circumstances of this matter, as set forth above, the following sanctions are appropriate: **Six-month suspension from the practice of law,[9] resignation from the State Bar of Arizona immediately upon reinstatement, and payment of the costs and expenses of the disciplinary proceeding.**

If Respondent violates any of the terms of this agreement, the State Bar may bring further discipline proceedings.

## LEGAL GROUNDS IN SUPPORT OF SANCTION

In determining an appropriate sanction, the parties consulted the American Bar Association's *Standards for Imposing Lawyer Sanctions* (*Standards*) pursuant to Rule 57(a)(2)(E). The *Standards* are designed to promote consistency in the imposition of sanctions by identifying relevant factors that courts should consider and then applying those factors to situations where lawyers have engaged in various types of misconduct. *Standard* 1.3, *In re Pappas*, 159 Ariz. 516, 768 P.2d 1161

---

[9] The period of suspension to become effective 45 days after entry of a judgment and order accepting this Agreement for Discipline by Consent.

(1988). The *Standards* provide guidance with respect to an appropriate sanction in this matter.

In determining an appropriate sanction, the Court considers the duty violated, the lawyer's mental state, the actual or potential injury caused by the misconduct and the existence of aggravating and mitigating factors. *Standard* 3.0.

The parties agree that the following *Standards* apply based on the facts and circumstances surrounding Respondent's conduct:

> *Standard* 4.42 – Suspension is generally appropriate when: (a) a lawyer knowingly fails to perform services for a client and causes injury or potential injury to a client; or (b) a lawyer engages in a pattern of neglect and causes injury or potential injury to a client.

> *Standard* 6.12 – Suspension is generally appropriate when a lawyer knows that false statements are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

> *Standard* 6.22 – Suspension is generally appropriate when a lawyer knowingly violates a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding.

**The duty violated**

Respondent's conduct violated his duty to the client, the profession, the legal system and the public.

**The lawyer's mental state**

Respondent's knowing and negligent conduct violated the Rules of Professional Conduct.

**The extent of the actual or potential injury**

There was harm and potential harm to clients, the general public, the legal system and the legal profession.

**Aggravating and mitigating circumstances**

The presumptive sanction is suspension. The parties conditionally agree that the following aggravating and mitigating factors should be considered:

**In aggravation:**

*Standard* 9.22(c) – Pattern of misconduct (Respondent engaged in similar misconduct in a number of client matters);

*Standard* 9.22(d) – Multiple offenses;

*Standard* 9.22(h) – Vulnerability of the victims (most clients spoke little or no English, were unfamiliar with the legal system in the United States, and were completely reliant on Respondent to properly represent them in their immigration proceedings); and

*Standard* 9.22(i) – Substantial experience in the practice of law (Respondent was admitted to practice law in Arizona on December 15, 2015, in Washington, D.C. on June 7, 2010, in Missouri on April 20, 2011, and in Texas on November 2, 2012).

**In mitigation:**

*Standard* 9.32(a) – Absence of a prior disciplinary record;

*Standard* 9.32(e) – Full and free disclosure to bar counsel or cooperative attitude toward the proceedings; and

*Standard* 9.32(j) – Delay in disciplinary proceedings.

**Discussion**

The parties conditionally agree that upon application of the aggravating and mitigating factors, the presumptive sanction is appropriate.

The parties conditionally agree that a greater or lesser sanction is not appropriate. A greater disciplinary sanction is not appropriate because Respondent has no prior disciplinary history, there was some delay in the disciplinary proceeding, and Respondent willingly entered into this Agreement for Discipline by Consent. A lesser disciplinary sanction is not appropriate because Respondent engaged in misconduct related to his representation of ten immigration clients and there was client harm in some instances and potential harm in other instances.

Based on the *Standards* and in light of the facts and circumstances of this matter, the parties conditionally agree that the sanction set forth above is within the range of appropriate sanction and will serve the purposes of lawyer discipline.

## CONCLUSION

The object of lawyer discipline is not to punish the lawyer, but to protect the public, the profession and the administration of justice. In re *Peasley*, 208 Ariz. 27 (2004). Recognizing that determination of the appropriate sanction is the prerogative

of the Presiding Disciplinary Judge, the State Bar and Respondent believe that the objectives of discipline will be met by the imposition of the proposed six-month suspension from the practice of law, Respondent's resignation from the State Bar of Arizona immediately upon his reinstatement, and the imposition of costs and expenses. A proposed form of order is attached hereto as Exhibit C.

    **DATED** this _28th_ day of March, 2025.

**STATE BAR OF ARIZONA**

         _/s/James D. Lee_____

         James D. Lee
         Senior Bar Counsel

    **This agreement, with conditional admissions, is submitted freely and voluntarily and not under coercion or intimidation. I acknowledge my duty under the Rules of the Supreme Court with respect to discipline and reinstatement. I understand these duties may include notification of clients, return of property and other rules pertaining to suspension.**

    **DATED** this _____ day of March, 2025.

         _____

         Joseph LaCome
         Respondent

of the Presiding Disciplinary Judge, the State Bar and Respondent believe that the objectives of discipline will be met by the imposition of the proposed six-month suspension from the practice of law, Respondent's resignation from the State Bar of Arizona immediately upon his reinstatement, and the imposition of costs and expenses. A proposed form of order is attached hereto as Exhibit C.

**DATED** this _____ day of March, 2025.

**STATE BAR OF ARIZONA**

_____
James D. Lee
Senior Bar Counsel

**This agreement, with conditional admissions, is submitted freely and voluntarily and not under coercion or intimidation. I acknowledge my duty under the Rules of the Supreme Court with respect to discipline and reinstatement. I understand these duties may include notification of clients, return of property and other rules pertaining to suspension.**

**DATED** this _____ day of March, 2025.

_____
Joseph LaCome
Respondent

**DATED** this 28th day of March, 2025.

Broening Oberg Woods & Wilson PC

**Donald Wilson, Jr.**
**Danielle Nicole Chronister**
Counsel for Respondent


Approved as to form and content

_____
Maret Vessella
Chief Bar Counsel


Original filed with the Disciplinary Clerk of
the Office of the Presiding Disciplinary Judge
of the Supreme Court of Arizona
this___ day of March, 2025.


Copy of the foregoing emailed
this _____ day of March, 2025, to:

The Honorable Margaret H. Downie
Presiding Disciplinary Judge
Supreme Court of Arizona
1501 West Washington Street, Suite 102
Phoenix, Arizona 85007
Email: officepdj@courts.az.gov

**DATED** this _____ day of March, 2025.

Broening Oberg Woods & Wilson PC

_____

**Donald Wilson, Jr.**
**Danielle Nicole Chronister**
Counsel for Respondent

Approved as to form and content

*/s/Maret Vessella_____*
Maret Vessella
Chief Bar Counsel

Original filed with the Disciplinary Clerk of
the Office of the Presiding Disciplinary Judge
of the Supreme Court of Arizona
this 28th day of March, 2025.

Copy of the foregoing emailed
this 28th day of March, 2025, to:

The Honorable Margaret H. Downie
Presiding Disciplinary Judge
Supreme Court of Arizona
1501 West Washington Street, Suite 102
Phoenix, Arizona 85007
Email: officepdj@courts.az.gov

Donald Wilson, Jr.
Danielle Nicole Chronister
Broening Oberg Woods & Wilson, PC
2800 North Central Avenue, Suite. 1600
Phoenix, Arizona 85004-1047
Email: dnc@bowwlaw.com
Respondent's Counsel


Copy of the foregoing hand-delivered
this 28th day of March, 2025, to:

Lawyer Regulation Records Manager
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, Arizona 85016-6266

by: */s/Jackie Brokaw*
        JDL/jlb

# EXHIBIT A

THE LAW OFFICE OF
**DENISE M. QUINTERRI, PLLC**

*161 E. Inverness Dr.  •  Oro Valley, AZ 85737  •  480-239-9807  •  dmq@azethicslaw.com*

February 21, 2025

Presiding Disciplinary Judge
C/o James Lee, Senior Bar Counsel
State Bar of Arizona
4201 N. 24th St., Ste. 100
Phoenix, AZ 85016

Via email only to: Jim.Lee@staff.azbar.org; Jackie.Brokaw@staff.azbar.org

      **Re:**    **Consent Agreement in State Bar File No. 23-0217 (Gomez Gonzalez)**

Dear Presiding Disciplinary Judge:

I write on behalf of my client, Holly Cooper, Co-Director of the Immigration Law Clinic at the UC Davis School of Law.  Ms. Cooper and the UC Davis Immigration Law Clinic represent the Complainant in the above-referenced file, Nery Osbeli Gomez Gonzalez, as well as his two children and his young cousin.

We received notice of a consent agreement to be filed and the opportunity to submit a written objection.  This is that objection.  Unfortunately, we did not receive a copy of the actual consent agreement, as apparently it is considered confidential until filed.  Therefore, we cannot address the agreement with any specificity.

We were informed that the terms would include a six-month suspension.  My client, and her client, are concerned that a six-month suspension is insufficient to protect the public.  As the court is aware, the formal complaint against Respondent in this matter now has ten counts, which include extremely serious charges.  Aside from general ineptitude (while charging excessive fees), there are <u>multiple counts involving dishonesty, including dishonesty to the Immigration Court/s</u>.  There is clear evidence of <u>forgery</u>.  Some of the counts, including the count relating to my client's clients, involve children.  All of the victims are vulnerable, no doubt, but taking advantage of children for money is particularly egregious and shocking to the conscience.

We understand that there is some provision in the agreement that Respondent will resign from the State Bar of Arizona immediately upon his reinstatement.  While this alleviates our concern somewhat, it does not remove it.  It is not clear what the effect would be in Respondent's other states of licensure, or before the USCIS.  If Respondent is able to have an active license in <u>any</u> state, he can continue to practice immigration law in <u>every</u> state.  Including in Arizona, so this

1

provision will not necessarily protect Arizona residents. Obviously, Respondent wants the shorter suspension for some reason—that reason is likely that it will help him continue to be licensed somewhere. It is also not clear how that provision would be enforced. It is, to my understanding, rather unusual.

Respondent routinely takes money from vulnerable individuals across multiple states, fails to provide any meaningful services, and refuses to refund the money. There are millions of desperate people seeking immigration law assistance — especially now. Allowing Respondent to be licensed again without the safeguards of a required reinstatement hearing puts people at risk. Not to mention that a short-term suspension on these facts looks bad.

Speaking of money, we are also concerned that there is no restitution order included in the consent agreement. Respondent did no work of any value for Mr. Gomez Gonzalez, his children or his cousin. The UC Davis Law Clinic had to start the process again from scratch. Respondent should not be permitted to retain the money paid to him for services he did not provide.

In closing, my client and her client do appreciate that the State Bar took the case and put in considerable time to investigate and to understand the various immigration law matters at issue. It isn't easy. Immigration law is definitely different. This objection is not intended to downplay our appreciation for Bar Counsel. In fact, we believe that the Bar has done a great job and all the evidence is there to support a long-term suspension.

Sincerely,

Denise M. Quinterri

Denise M. Quinterri

2

# EXHIBIT B

## Statement of Costs and Expenses

In the Matter of a Member of The State Bar of Arizona,
Joseph LaCome, Bar No. 032676, Respondent.

File Nos. 22-2090, 23-0217, 23-1443, 23-3115, 24-0602,
24-2989, 24-2264, and 24-2193

### Administrative Expenses

The Supreme Court of Arizona has adopted a schedule of administrative expenses to be assessed in lawyer discipline.  If the number of charges/complainants exceeds five, the assessment for the general administrative expenses shall increase by 20% for each additional charge/complainant where a violation is admitted or proven.

Factors considered in the administrative expense are time expended by staff bar counsel, paralegal, secretaries, typists, file clerks and messenger; and normal postage charges, telephone costs, office supplies and all similar factors generally attributed to office overhead.  As a matter of course, administrative costs will increase based on the length of time it takes a matter to proceed through the adjudication process.

***General Administrative Expenses***
***for above-numbered proceedings***                    **$1,200.00**

Additional costs incurred by the State Bar of Arizona in the processing of this disciplinary matter, and not included in administrative expenses, are itemized below.

### Additional Costs

| | | |
|---|---|---|
| 11/07/24 | Deposition | $  250.00 |
| Total for additional costs | | $  250.00 |

Total Costs and Expenses for each matter over 5 cases where a violation is admitted or proven.
(5 x (20% x $1,200)):                                        $1,200.00

TOTAL COSTS AND EXPENSES INCURRED                    $2,650.00

**EXHIBIT C**

# BEFORE THE PRESIDING DISCIPLINARY JUDGE

| | |
|---|---|
| In the Matter of a Member of the State Bar of Arizona,<br><br>**JOSEPH LACOME,**<br> Bar No. 032676,<br><br> Respondent. | **PDJ 2023-9099**<br><br>**FINAL JUDGMENT AND ORDER**<br><br>[State Bar Nos. 22-2090, 23-0217, 23-1443, 23-3115, and 24-0602] |

The Presiding Disciplinary Judge of the Supreme Court of Arizona, having reviewed the Agreement for Discipline by Consent pursuant to Rule 57(a), Ariz. R. Sup. Ct., accepts the parties' proposed agreement.

Accordingly:

**IT IS ORDERED** that Respondent, **Joseph LaCome**, is suspended from the practice of law for six months for his conduct in violation of the Professional Conduct Rules of the Executive Office for Immigration Review and the Arizona Rules of Professional Conduct, as outlined in the consent document, effective 45 days from the date of this order.

**IT IS FURTHER ORDERED** that, upon reinstatement, Respondent shall immediately resign from the State Bar of Arizona.

1

**IT IS FURTHER ORDERED** that, pursuant to Rule 72 Ariz. R. Sup. Ct., Respondent shall immediately comply with the requirements relating to notification of clients and others.

**IT IS FURTHER ORDERED** that Respondent pay the costs and expenses of the State Bar of Arizona in the amount of $_____ within 30 days from the date of service of this Order.

**IT IS FURTHER ORDERED** that Respondent shall pay the costs and expenses incurred by the disciplinary clerk and/or Presiding Disciplinary Judge's Office in connection with these disciplinary proceedings in the amount of $_____ within 30 days from the date of service of this Order.

**DATED** this _____ day of March, 2025.

_____
**Lisa A. VandenBerg,**
**Presiding Disciplinary Judge**

Original filed with the Disciplinary Clerk of
the Office of the Presiding Disciplinary Judge
of the Supreme Court of Arizona
this _____ day of March, 2025.

Copies of the foregoing emailed
this _____ day of March, 2025, to:

Donald Wilson, Jr.
Danielle Nicole. Chronister
Broening Oberg Woods & Wilson, PC

2

2800 North Central Avenue, Suite 1600
Phoenix, Arizona 85004-1047
Email: dnc@bowwlaw.com
Respondent's Counsel

James D. Lee
Senior Bar Counsel
State Bar of Arizona
4201 North 24th Street, Suite 100
Phoenix, Arizona 85016-6266
Email: LRO@staff.azbar.org

by: _____